**AIR TRANSPORT ASSOCIATION OF AMERICA, Plaintiff,**

**National Air Carrier Association, Inc., Plaintiff-Intervenor,**

v.

**FEDERAL ENERGY OFFICE et al., Defendants.**

**Civ. A. No. 74–826.**

United States District Court, District of Columbia.

Sept. 25, 1974.

Bert W. Rein, of Kirkland, Ellis & Rowe, Washington, D. C., for plaintiff, Air Transport Association of America.

Charles C. Abeles, of Lichtman, Abeles, Anker & Nagle, P. C., Washington, D. C., for intervenor-plaintiff, National Air Carrier Association, Inc.

Winston Miller, Atty., Dept. of Justice, for defendants.

## OPINION

WILLIAM B. JONES, District Judge.

This is an action challenging as unlawful, arbitrary and capricious certain price control regulations of the Federal Energy Administration.[1]   10 C.F.R., Part 210 and Part 212, 39 Fed.Reg. 1924 et seq. (Jan. 15, 1974). In particular, the complaint challenges the "special product"/"other than special product" classifications and the cost carryover provisions of the regulations as they are applied to aviation fuel.   Declaratory and injunctive relief is sought.

The challenged regulations were promulgated pursuant to authority vested in the President in the Emergency Petroleum Allocation Act of 1973, P.L. 93–159, 15 U.S.C. § 751 et seq.

The plaintiff, Air Transport Association of America (ATA), is an unincorporated non-profit association whose members include 26 scheduled air car-

---

1. The complaint herein names as a defendant the Federal Energy Office (FEO). On June 25, 1974, however, the President, acting under authority of the Federal Energy Administration Act of 1974 (P.L. 93–275), abolished FEO and transferred all authority exercised by FEO · to the newly established Federal Energy Administration (FEA).   Executive Order No. 11790 (June 25, 1974).   The President also continued in effect all FEO regulations, interpretations and orders until modified, amended or revoked by FEA. *Id.* at § 5(c).   Section 8(c) of the Federal Energy Administration Act provides that the Act "shall not affect suits commenced prior to the date th[e] Act takes effect" and that "in all such suits proceeding shall be had, appeals taken, and judgments rendered, in the same manner and effect as if this Act had not been enacted."   This action, therefore, is not affected by the transition of FEO to FEA.

riers serving both American and foreign airports. The plaintiff-intervenor, National Air Carrier Association, Inc. (NACA), is a non-profit corporation whose membership is comprised of the five major United States supplemental air carriers performing charter services domestically and internationally.

The defendant, Federal Energy Office (FEO/FEA), was established in the Executive Office of the President of the United States by Executive Order No. 11748 of December 4, 1973 [38 Fed.Reg. 33575 (Dec. 6, 1973)] under which the President (a) delegated to the Administrator of FEO (i) all the authority vested in the President by the Emergency Petroleum Allocation Act of 1973, (ii) all the authority vested in the President by Section 203(a)(3) of the Economic Stabilization Act of 1970, as amended (12 U.S.C. § 1904 note), and (iii) the authority vested in the President by the Defense Production Act of 1950, as amended (50 U.S.C. App. § 2061 et seq.), as it relates to production, conservation, use, control, distribution, and allocation of energy; and (b) directed the Cost of Living Council to delegate certain of its authority under the Economic Stabilization Act of 1970 to the Administrator of FEO. On December 26, 1973, the Cost of Living Council delegated to FEO the authority to administer the petroleum pricing regulations issued under the Economic Stabilization Act of 1970 (COLC Order No. 47, December 26, 1973). As detailed in footnote 1, the FEO has since become the Federal Energy Administration (FEA). The identity and position of the other defendants appear sufficiently in the caption.

This matter is presently before the Court on cross-motions for summary judgment.[2]

## I. THE STATUTE

The Emergency Petroleum Allocation Act of 1973 (hereinafter the "EPAA")

was enacted by Congress and approved by the President on November 27, 1973. Findings of an impending energy crisis and possibly deleterious effects resulting therefrom are made and the purpose of the Act is then set forth as follows:

> (b) The purpose of this Act is to grant to the President of the United States and direct him to exercise specific temporary authority to deal with shortages of crude oil, residual fuel oil, and refined petroleum products or dislocations in their national distribution system. The authority granted under this Act shall be exercised for the purpose of minimizing the adverse impacts of such shortages or dislocations on the American people and the domestic economy.

EPAA § 2(b), 15 U.S.C. § 751(b).

To achieve this purpose, the Act authorizes and directs the President to adopt within 15 days of enactment and to implement 15 days thereafter a program providing for the mandatory allocation of crude oil, residual oil, and refined petroleum products in amounts and at prices specified in (or determined in a manner prescribed by) the regulations effecting the program. EPAA § 4(a), 15 U.S.C.A. § 753(a). The Act further requires that, to the maximum extent practicable, the program, as set forth in the regulations, be so constructed as to accomplish specific congressionally defined objectives. In this respect, Section 4(b)(1) of the Act, 15 U.S.C. § 753(b)(1), provides:

> (b)(1) The regulation under subsection (a), to the maximum extent practicable, shall provide for—
>
> (A) protection of public health, safety, and welfare (including maintenance of residential heating, such as individual homes, apartments, and similar occupied dwelling units), and the national defense;

---

2. Certain affidavits submitted in support of both motions are not in strict compliance with Rule 56(e), Fed.R.Civ.P. However, respective counsel for each party, in open court, explicitly waived any objection they might have based on such deficiencies.

(B) maintenance of all public services (including facilities and services provided by municipally, cooperatively, or investor owned utilities or by any State or local government or authority, and including transportation facilities and services which serve the public at large);

(C) maintenance of agricultural operations, including farming, ranching, dairy, and fishing activities, and services directly related thereto;

(D) preservation of an economically sound and competitive petroleum industry; including the priority needs to restore and foster competition in the producing, refining, distribution, marketing, and petrochemical sectors of such industry, and to preserve the competitive viability of independent refiners, small refiners, nonbranded independent marketers, and branded independent marketers;

(E) the allocation of suitable types, grades, and quality of crude oil to refineries in the United States to permit such refineries to operate at full capacity;

(F) equitable distribution of crude oil, residual fuel oil, and refined petroleum products at equitable prices among all regions and areas of the United States and sectors of the petroleum industry, including independent refiners, small refiners, nonbranded independent marketers, branded independent marketers, and among all users;

(G) allocation of residual fuel oil and refined petroleum products in such amounts and in such manner as may be necessary for the maintenance of exploration for, and production or extraction of, fuels, and for required transportation related thereto;

(H) economic efficiency; and

(I) minimization of economic distortion, inflexibility, and unnecessary interference with market mechanisms.

With respect to the specification of prices, the Act further requires:

(A) a dollar-for-dollar passthrough of net increases in the cost of crude oil, residual fuel oil, and refined petroleum products to all marketers or distributors at the retail level; and

(B) the use of the same date in the computation of markup margin, and posted price for all marketers or distributors of crude oil, residual fuel oil and refined petroleum products at all levels of marketing and distribution. EPAA § 4(b)(2), 15 U.S.C. § 753(b)(2).

## II. THE FEA PRICE REGULATIONS

The FEA price regulations provide that refiners may not charge to any class of purchaser a price in excess of a "maximum lawful price," which is the "base price" plus "increased product costs." The "base price" is the weighted average price at which the product was lawfully priced in transactions with the particular class of customer on May 15, 1973. 10 C.F.R. § 212.82(f). "Increased product costs" equal the sum of net increases over May, 1973 costs for purchases of domestic and foreign petroleum products for resale. 10 C.F.R. § 212.83(b)(c).

The mechanism for allocation of these costs is divided into two categories—"special products" and "other than special products." "Special products" include gasoline, No. 2 heating oil, No. 2–D diesel fuel and propane. Each of these "special products" may be allocated, at a maximum, the increased product costs proportionate to their percentage of the refiner's sales. 10 C.F.R. § 212.-83(c)(i).

Aviation fuel is a member of the "other than special products" category. This category also includes such products as No. 1 heating oil, No. 4 fuel oil, Nos. 1–D and 4–D diesel fuel and kerosene. Allocation of costs in this class is not restricted by the "special product" rules. Indeed, a refiner is permitted to increase the May 15, 1973 price of an "other than special product" by apportioning the total amount of his in-

creased costs both for "other than special products" and, to the extent he chooses not to allocate a full proportionate share of costs to any "special product," for "special products" in "whatever amount he deems appropriate." 10 C.F.R. § 212.83(c)(ii).

FEA regulations require that "the amount of increased product costs included in computing base prices of a particular covered product other than a special product be applied equally to each class of purchaser." 10 C.F.R. § 212.83(c)(ii). "Class of purchaser" is defined as "purchasers or lessees to whom a person has charged a comparable price for comparable property or service pursuant to customary price differentials between those purchasers or lessees and other purchasers or lessees." 10 C.F.R. § 212.31.

Where a refiner charges some "class of purchasers" less than the maximum lawful price in transactions during a particular month, because of contractual commitments or other commercial considerations, FEA regulations permit the difference between the maximum lawful price and the lower price actually charged to be treated as "unrecovered cost" available for passthrough in subsequent months. These "banked costs" may then be used to calculate the maximum lawful price in subsequent months provided they are applied equally to each class of purchasers in computing maximum lawful prices in that month. 10 C.F.R. § 212.83(d); *see generally* FEO Ruling 1974–12, 39 Fed.Reg. 18423 (May 26, 1974).

The treatment of unrecovered costs was modified when FEA, on August 30, 1974, promulgated an emergency amendment to Part 212 of its Mandatory Petroleum Price Regulations. Specifically, 10 C.F.R. §§ 212.83(d) and 212.93(e) were amended, effective September 1, 1974, to provide that if, as a result of market considerations or contracts entered into after September 1, 1974, a refiner elects to apply a lesser amount of costs to one class of purchaser than an-

other, each class will be deemed to have been allocated the largest amount of costs actually allocated to any one class for purposes of determining which costs may be carried over. However, this change has no immediate effect on contracts entered into on or before September 1, 1974, since it does not affect costs "banked" as a result of the earlier contracts. 39 Fed. Reg. 32396 et seq. (Sept. 5, 1974).

### III. APPLICATION OF THE FEA PRICE REGULATIONS TO AVIATION FUELS

Aviation fuel is not subject to "special product" treatment under the FEA regulations. Thus, theoretically, up to 100% of all "increased product costs" could be allocated to the price of aviation fuels. This does not, however, present an accurate description of the aviation fuel marketplace. In fact, it appears from the data submitted by the parties that, on average, refiners have recouped less than the volumetric share of the total increased product costs "attributable" to aviation fuel. The principal factor explaining this underrecoupment is the traditional existence of long term fuel contracts negotiated by most civil air carriers with their refiner-suppliers. While many of these contracts contain price escalator provisions which allow for some fuel cost increases, the contracts nevertheless appear to provide a barrier to disproportionate or even full recoupment by refiner-suppliers. Also, because of the "banking" rules and the requirement that any price increase be equally applied to each "class of purchaser," the contracts tend to indirectly act as a disincentive to the passthrough of increased product costs to compute maximum lawful prices for non-contract purchases. Affidavit of defendant Federal Energy Administrator Sawhill, paras. 14, 15 (hereinafter "Sawhill Aff.").

From figures provided to the FEA by the ATA, it appears that approximately 75% of all domestic kerosene base aviation fuel is presently purchased by scheduled carriers under long term con-

tracts signed prior to January 1974. In January 1974, 90% of this fuel was under contract and by January 1975, roughly 60% of such fuel will still be purchased under contracts negotiated prior to January 1974. Sawhill Aff., para. 14. The percentage of fuel purchased under contract by members of the NACA is considerably less. In January 1974, approximately 83% of the fuel used by NACA members was supplied under contracts providing some price protection. By July 1, 1974, however, this figure dropped below 23% and by January 1, 1975, less than 10% of purchases by NACA members will be under price-protected long-term contracts. Affidavit of S. S. Colker, economic consultant retained by intervening plaintiff, NACA, dated July 10, 1974, para. 6.

It is not entirely clear the extent to which individual carriers enjoy the protection of long-term contracts. The government asserts that the average weighted price figures, "besides reflecting an industry-wide price, also provide a not inaccurate picture of the individual carrier's position since each carrier purchases aviation fuel through both contract and non-contract transactions." In addition, it is asserted that "the average weighted industry figure is not substantially different, dollarwise, than the individual carrier's average price." Affidavit of Bert M. Concklin, FEA Acting Deputy Assistant Administrator for Policy Integration and Evaluation, dated July 19, 1974, para. 9.

Plaintiffs dispute this assertion, claiming that the mix of contract and non-contract prices is substantially different among carriers:

For example, almost the entire amount of fuel consumed domestically by Pan American at the present time and all of the fuel consumed by Aloha Airlines in May was purchased without contract price protection. TWA, with only 44% of its purchases pursuant to contract, paid 25.36 cents per gallon in May. Furthermore, the terms of the

contracts that the various airlines have with their suppliers are not uniform. Accordingly, National (16.35 cents per gallon in May) and Texas International (16.38 cents per gallon in May) purchase almost all of their jet fuel pursuant to long-term contracts which contain significant fixed-price protection, whereas United, although purchasing almost all of its jet fuel pursuant to long-term contracts, has nevertheless seen a steady increase in its average price from 16.54 cents per gallon in January to 21.46 cents per gallon in May.

Affidavit of Timothy N. Gallagher, Special Assistant for Energy to the Senior Vice President, Operations and Airports of the plaintiff, ATA, dated August 7, 1974, para. 10.

The government responds:

First, Pan American's domestic fuel consumption represents only about six per cent of its total fuel purchases. Second, the use of the word 'almost' suggests that even these purchases are to some extent pursuant to contract. Third, CAB figures showing domestic fuel consumption and cost for the month of June indicate that Pan American's average price *decreased* from an average of 30.049 cents per gallon in May 1974 to 27.855 in June 1974. Finally, Aloha Airlines purchases for both the months of May and June represented only .2 percent of the fuel purchased by the nineteen carriers and Aloha. (empahsis in original)

Affidavit of Bert M. Concklin, dated August 21, 1974, para. 2 (hereinafter "Concklin Aff. II").

Considerable data relating to the recoupment by refiners for increased crude costs in prices charged for aviation fuel has been submitted by the parties. When the effect of pre-existing long-term contracts is taken into account, these figures, with the exception of the prices charged NACA members for the month of January 1974, demonstrate a consistent pattern of underre-

coupment by refiners for increased crude costs which are "attributable" to aviation fuel sold to both ATA and NACA members. It thus appears that refiners have recouped less than would be allowable even if aviation fuel were classified as a "special product."[3]

A final consideration is the extent to which refiners have allocated special product costs to other than special products. In this regard, the FEA submits that

> . . . an examination of the 14 major refineries, which supply approximately 95 percent of domestic aviation fuel, has disclosed that six, supplying over ⅓ of the market share, have allocated *no* special product costs to other than special products in the past eight months and of the costs attributed to other than special products by the remaining eight, only 5.2% originated from those costs otherwise attributable to special products. This information is derived from FEA forms submitted by refiners to the agency on a monthly basis.

Concklin Aff. II, para. 4. There is no indication the extent to which the 5.2% has been apportioned to aviation fuel; however, it is worthy of note that aviation fuel is but one of numerous products classified as an "other than special product."

## IV. FEA HAS ACTED WITHIN ITS AUTHORITY IN PROMULGATING THE CHALLENGED REGULATION

■ The scope of this inquiry is necessarily limited to a determination of whether the challenged regulation is in excess of FEA's authority under the EPAA, is arbitrary or capricious, or is otherwise unlawful under the criteria set forth in 5 U.S.C. § 706(2). EPAA, § 5(a)(1), 15 U.S.C. § 754(a)(1) (incorporating by reference § 211 of the Economic Stabilization Act of 1970, 12 U.S.

C. § 1904 note); Pacific Coast Meat Jobbers Ass'n v. Cost of Living Council, 481 F.2d 1388 (Em.App.1973); Trans World Airlines, Inc. v. FEO, 380 F. Supp. 560, at 565 (D.D.C.1974).

■ It is clear that the FEA, like every other agency exercising legislatively delegated authority, is "bound to exercise its discretion within the limits of the standards expressed by the [Act]." FPC v. Texaco, Inc., No. 72–1490, 417 U.S. 380, 396, 94 S.Ct. 2315, 2325, 41 L.Ed.2d 141 (1974). Where the parties here diverge is on the question of the breadth of the Congressionally defined zone of administrative discretion and the precise location of the boundaries limiting or, conversely, authorizing regulatory activity on the part of the FEA. Plaintiffs here view the EPAA as a relatively restrictive statute which sets forth specific objectives and priorities and bestows narrowly defined discretionary authority in the FEA. The FEA, on the other hand, urges a more expansive reading of the EPAA. Arguing that the several objectives of the Act at times necessarily conflict with one another, the FEA maintains that its discretion is unavoidably much broader than the view espoused by plaintiffs.

■ It is the Court's opinion that plaintiffs' allegations and arguments suffer from a fundamental flaw: they interpret the EPAA in a manner overly restrictive of the discretionary powers vested in the FEA. More specifically, plaintiffs endeavor to pick and choose among the nine objectives set forth in Section 4(b)(1) of the Act in a manner which best serves their own interests. Thus, plaintiffs maintain that the EPAA *requires* the FEA (1) to provide special product treatment for aviation fuel and (2) to modify its "banking" rules because Sections 4(b)(1)(B) and (F) provide for the "maintenance of all public services (. . . including trans-

---

3. Some of the data submitted by plaintiffs would suggest a different conclusion. However, that data is based solely upon new contract and non-contract purchases which rep-

resent only the highest figures currently paid irrespective of the restraining effects of existing long-term contracts.

portation facilities and services which serve the public at large)" and for the "equitable distribution of . . . refined petroleum products at equitable prices . . . and among all users." 15 U.S.C. §§ 753(b)(1)(B) and (F). Such an assertion, in addition to misconstruing the "equitable price" provision (discussed *infra*), emphasizes two Congressionally recognized goals while ignoring the other seven. Moreover, it attempts to impose a duty on the FEA to promote and insure the full accomplishment of those two goals without regard for and possibly in derogation of the other seven. This is not a proper construction of the EPAA.

■ Plaintiffs direct the Court's attention to language found in the "purposes" provision of the Act which directs the President "to exercise specific temporary authority to deal with shortages." EPAA § 2(b), 15 U.S.C. § 751(b). Even aside from the ambiguous nature of the cited language, the general section setting forth the legislative purpose of the Act is not an operative section and may not prevail over other specific provisions. *See* Bissette v. Colonial Mortgage Corp. of D.C., 155 U.S.App.D. C. 360, 477 F.2d 1245 (1973).

Plaintiffs' misapprehension of congressional intent is further manifest by the following explanation found in the Conference Report:

Very generally stated [the objectives defined in section 4(b)] establish guidelines for the priority uses of fuels covered by this Act and set forth standards of action concerning the competitive structure of the industry and general economic policy to be followed in the establishment of the fuel allocation program.

The listing of objectives in successive paragraphs (A) through (I) in section 4(b)(1) is not intended to establish any order of priority. These are collective goals, and the conferees have not attempted to discern an order of precedence or value one against another. It is fully recognized that,

in some instances, it may be impossible to satisfy one objective without sacrificing the accomplishment of another. . . . For this reason the Committee has qualified the direction to the President . . . that the regulation be so constructed as to accomplish the enumerated objectives 'to the maximum extent practicable.' This qualification is intended to give the President administrative flexibility in marshalling short supplies and assigning them to particular needs.

H.R.Conf.Rep.No. 93–682, U.S.Code Cong. and Admin.News, 93d Cong. 1st Sess., pp. 2688, 2688–2689 (1973) (hereinafter "Conf.Rep.") ; *see also* H.R.Rep. No. 93–531, U.S.Code Cong. and Admin. News, 93d Cong. 1st Sess., pp. 2582, 2590 (1973) (hereinafter "House Rep."). Even more emphatic in this regard is the following portion of the House Report:

First, the Committee has not attempted to fashion a mandatory allocation program of its own conception. The petroleum industry is one of the largest and most complex in the world. To freeze in statutory terms an allocation program for this industry would simply not be good policy. Administrative flexibility is a prerequisite and, consequently, the Committee has decided to recommend that the Executive be assigned the responsibility for crafting the program pursuant to Congressionally defined (though generally stated) objectives.

House Rep., *supra* at p. 2589.

The need for administrative flexibility, particularly with respect to the exercise of pricing authority, is further shown by this language of the Conference Report:

The reference to equitable prices in the bill is specifically intended to emphasize that one of the objectives of the mandatory allocation program is to prevent price gouging or price discrimination which might otherwise occur on the basis of current shortages. On the other hand, it is contemplated

that prices for allocated fuels will be set at levels or pursuant to methods which will permit adequate compensation to assure that private property is not implicitly confiscated by the government. *Most importantly, the President must, in exercising this authority, strike an equitable balance between the sometimes conflicting needs of providing adequate inducement for the production of an adequate supply of product and of holding down spiraling consumer costs.* (emphasis added) Conf.Rep., *supra* at pp. 2702–2703.

■ Plaintiffs assert that a major purpose of the EPAA was to restrict pricing authority existing under the Economic Stabilization Act of 1970. 12 U.S.C. § 1904 note. Thus, they argue that the FEA acted contrary to Congressional intent by adopting the Cost of Living Council regulations pertaining to the pricing of aviation fuel. The Act's legislative history refutes such an assertion. As the Conference Report indicates:

Section 116 of the Senate bill provided that the Congress found and declared that, notwithstanding the imposition of mandatory controls by the Cost of Living Council on March 6, 1973, on the prices of crude oil and petroleum products, such prices had increased and were continuing to increase at an excessive rate and that in order to control inflation, promote a sound economy, and carry out the objectives of the Senate bill as stated in section 102, the Congress urged the President immediately to take such further action as may be necessary to stabilize effectively the prices of crude oil and petroleum products.

Conf.Rep., *supra* at p. 2702. The Conference Committee rejected the above cited portion of the Senate bill and substituted the provisions of the House amendment with a change making the House provisions applicable to residual fuel oil. *Id.*

Moreover, the Conference Report continues:

The committee wishes to emphasize that the pricing controls called for in this legislation may, in those circumstances where pricing controls established pursuant to other federal authority are consistent with the requirements and objectives of this Act, merely confirm those controls in the regulation to be promulgated under authority of section 4 of this Act. *It is expressly contemplated, for example, that the price controls established by Phase IV under authority of the Economic Stabilization Act would continue in effect unless and until required to be modified by the price regulation required to carry out the purposes of this Act.* As a matter of administrative convenience, the President may wish to continue to exercise federal pricing controls through the Cost of Living Council and may, pursuant to section 5(b), assign to that agency responsibility for administering the price controls called for in this Act. (emphasis added)

*Id.* Plaintiffs would emphasize the portion italicized above and argue that this language expressed a directive to modify the Phase IV controls. To the contrary, that language not only makes no express congressional finding of a needed change but, indeed, leaves the matter of determining when changes are required to the discretion of the Administrator.

■ Thus, the legislative history of the EPAA indicates that Congress set forth nine broad and equally ranked goals which are to be accomplished "to the maximum extent practicable." Congress recognized that these goals would necessarily conflict at times and that the President (or his delegate) would likewise necessarily be required to exercise discretion ("administrative flexibility") in their implementation.

Because the EPAA expresses a mandate phrased in broad permissive terms, the cases of Addison v. Holly Hill Co., 322 U.S. 607, 64 S.Ct. 1215, 88 L.Ed. 1488 (1944), and Zuber v. Allen, 396 U. S. 168, 90 S.Ct. 314, 24 L.Ed.2d 345

(1969), cited by plaintiffs, are clearly distinguishable, as they involved narrowly defined Congressional mandates. However, other cases interpreting the EPAA itself are apposite to the inquiry here. In Union Oil Company v. FEA, CV 74–1943–MML (C.D.Cal. July 25, 1974), plaintiff challenged certain regulations of the FEA which require it to supply several million barrels of crude oil to certain small and independent refiners at a price equal to its "weighted average price" plus certain additions. Union argued, inter alia, that the price regulations regarding allocated crude oil were in excess of statutory authority because they contravened the Act's purpose of promoting economic efficiency. Judge Lucas, in rejecting this contention, stated:

> Assuming that the pricing regulation ran contrary to economic efficiency, and thereby was contrary to one purpose of the Act, that would not mean that the regulation is invalid. Economic efficiency is only one of ten [sic] separate goals listed in § 4(b) of the Act. The goals are inherently inconsistent, and no regulation could promote all of them at the same time. Congress recognized this in saying that the regulations shall provide for them 'to the maximum extent practicable.' A balancing of goals is required, and Congress has left the details of this balancing to the Federal Energy Administration. Even if the regulation is somehow contrary to concepts of economic efficiency, that does not mean that the Federal Energy Administration has misperformed its function.

Slip Op. at 6.

This same issue has arisen in a case of this Court, Trans World Airlines, Inc. v. FEO, *supra*, where plaintiff argued that the statutory objective of "equitable prices," set forth in Section 4(b)(1)(F) of the Act, 15 U.S.C. § 753(b)(1)(F), required FEA to issue regulations providing for "equal prices" to all air carriers irrespective of con-

tractual protections enjoyed by some air carriers. In denying TWA's motion for a preliminary injunction, the Court recognized the necessity of FEA's balancing the various statutory objectives in establishing price regulations. Judge Corcoran stated in pertinent part:

> Granted that the FEO might have devised another method of managing the required passthrough of a refiner's costs to the air carriers, the Court cannot say that the regulations of the FEO and their application have no rational basis or that they are inconsistent with the congressional mandate. Nor can it be said that when the FEO was faced with seemingly, inconsistent mandates, *i. e.*, to establish 'equitable prices' and at the same time to minimize economic distortion and unnecessary interference with market mechanisms, it acted arbitrarily, capriciously or irrationally in placing the emphasis upon the maintenance of market mechanisms rather than construing equitable prices to mean equal prices. The Court may not substitute its judgment for that of the FEO.

380 F.Supp. at 567.

■ The EPAA's statutory language, legislative history, and judicial interpretation all support a conclusion that FEA possesses considerable administrative latitude in establishing a regulatory scheme which strives to achieve the nine objectives of Section 4(b)(1) of the Act, 15 U.S.C. § 753(b)(1), "to the maximum extent practicable." Thus, FEA is not acting in derogation of its authority under the Act when it fails to provide for the total accomplishment of two of the Act's objectives to the exclusion of the other seven. Furthermore, the airlines' statutory priority under Section 4(b)(1)(B), 15 U.S.C. § 753(b)(1)(B), does not automatically entitle them to preferential pricing treatment accorded "special products."

Plaintiffs have also alleged that, in a "real world" sense, the FEA price regulations provide no direct controls what-

soever and, indeed, that prices have *de facto* been deregulated in violation of the procedural requirements of § 4.(g)(2) of the Act[4] because they may be determined in large extent by market forces. Defendants reply that the ascertainable and limiting "maximum lawful price" of the regulations, particularly when coupled with the economic effects of long-term contracts and the "class of purchaser" requirements of the regulation, meet the mandates of § 4(a) ["regulation providing for mandatory allocation . . . at prices specified in . . . (or determined in a manner prescribed by) ,such regulation"] and § 4(b)(1)(F) ["equitable distribution . . . at equitable prices"] of the Act. 15 U.S.C. §§ 753(a) and 753(b)(1)(F).

In support of their position, plaintiffs place principal reliance on the Supreme Court's recent opinion in FPC v. Texaco, Inc., *supra*. That case involved the validity of an FPC order exempting small producers of natural gas from direct rate regulation, but subjecting their rates to indirect regulation through the Commission's review of the cost of gas purchased from them by pipelines and large producers who were to be permitted to file "tracking increases" in their regulated sales rates, but who were to be required to make refunds to their customers (unrecoverable from the small producers) for that part of their rates attributable to small producer rates which were "unreasonably high," considering appropriate comparisons with highest contract prices for sales by large producers or the prevailing market price for intrastate sales in the same producing area. In proceedings to review the Commission's order, the Court of Appeals for this Circuit set aside the order, holding that it constituted an unauthorized "deregulation" of small producers since it failed to provide a mechanism

for insuring that their rates would be "just and reasonable," as required by the Natural Gas Act. 154 U.S.App.D.C. 168, 474 F.2d 416 (1972). On certiorari, the Supreme Court vacated the Court of Appeals' judgment and remanded the case with directions that the Court of Appeals remand to the Commission for further proceedings.

Plaintiffs urge particular attention to that portion of the opinion in which the Court discusses the legality of "market force" control under the Natural Gas Act:

> For the purposes of the proceedings that may occur on remand, we should also stress that in our view the prevailing price in the market place cannot be the final measure of 'just and reasonable' rates mandated by the Act . . . . In subjecting producers to regulation because of anticompetitive conditions in the industry, Congress could not have assumed that 'just and reasonable' rates could conclusively be determined by reference to market price.

417 U.S. at 397, 94 S.Ct. at 2326. Plaintiffs analogize this holding to the facts here and argue that the FEA, like the FPC, is without authority to substitute market forces for congressional mandates. However, because of the basic differences between the two underlying legislative mandates, this analogy is unfounded.

■ The "equitable price" objective of Section 4(b)(1)(F) of the EPAA, 15 U.S.C. § 753(b)(1)(F), is not mandatory; instead, it is only one of several goals which the FEA is directed to achieve to the "maximum extent practicable." On the other hand, Section 4(a) of the Natural Gas Act is mandatory and is not to be considered only "to the maximum extent practicable." To the

---

4. Section 4(g)(2) of the EPAA, 15 U.S.C. § 753(g)(2), in general, permits the President to amend the regulation to exempt certain oil or products from regulation provided he makes specific findings detailed in this sub- section. The amendment and findings must be submitted to the Congress, and either House may disapprove the amendment. *See* Conf.Rep., *supra* at p. 2696.

contrary, Section 4(a) of that Act, 15 U.S.C. § 717c(a), provides:

> All rates and charges made, demanded, or received by any natural-gas company for or in connection with the transportation or sale of natural gas subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges, *shall be just and reasonable, and any rate or charge that is not just and reasonable is declared to be unlawful.* (emphasis added)

The mandatory nature of the "just and reasonable" standard was expressly recognized by the Supreme Court:

> The Court of Appeals rejected what it apparently understood was 'the Commission's basic contention all along that the "just and reasonable rate standard" was not mandatory and that the FPC can simply choose not to regulate rates.' Whatever the position of the Commission heretofore has been, it wisely does not challenge that aspect of the Court of Appeals judgment. Sections 4 and 5 of the Natural Gas Act require that all gas rates be just and reasonable; and the Court held in *Phillips* [Petroleum Co. v. Wisconsin, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954)] that this very prescription applies to the rates of all gas producers. The Commission may have great discretion as to how to insure just and reasonable rates, but it is plain enough to us that the Act does not empower it to exempt small producer rates from compliance with that standard.

FPC v. Texaco, Inc., *supra,* 417 U.S. at 394, 94 S.Ct. at 2324. Thus, FPC v. Texaco, Inc. is factually distinguishable. *See generally* Bowles v. Willingham, 321 U.S. 503, 516–517, 64 S.Ct. 641, 88 L.Ed. 892 (1944) (Section 2(b) of the Emergency Price Control Act of 1942, 56 Stat. 23, requiring the fixing of maximum rents which are "generally fair and equitable" distinguishable from mandatory directives under such price-fixing statutes as Natural Gas Act).

The question remains whether the setting of a "maximum lawful price" which permits considerable price interaction by market forces fulfills the requirements of Section 4(a) of the Act that "prices [be] specified in (or determined in a manner prescribed by) such regulation." 15 U.S.C. § 753(a). Relevant to a consideration of this issue is Judge Robinson's opinion in Consumers Union v. Sawhill, Civil Action No. 74–722 (D.D.C. July 31, 1974). In that action, plaintiff challenged certain portions of the FEA pricing regulations [10 C.F.R. §§ 212.53(a), 212.53(b), 212.-74(a), and 212.74(b)] which provide that the price of "new" crude oil is to be determined by the market price rather than by a fixed ceiling price. Consumers Union argued that Section 4(a) of the EPAA required a fixed ceiling price. In granting summary judgment to the FEA, the Court found:

> Plaintiff insists that the statute requires that the price of all regulated oil be 'controlled.' This Court can find no such requirement in the language or scheme of the statute. A mandate to prescribe prices, necessarily implies authority to limit prices, but does not mandate such a limit. The statute requires that some prescription for determining allowable prices must be provided. The level of those prices is to be in the discretion of the Administrator, consistent with enumerated statutory goals and certain specific provisions not here relevant. The Administrator's determination that for the present the free market price is appropriate is in compliance with the statute. Such a determination is not an 'exemption' from regulation under the act, because all oil remains subject to allocation and price controls. Nor does such a determination by the Administrator necessarily mean that such a price is inequitable or that said price is unregulated. Federal Power Commission v. Texaco, Inc., 417 U.S. 380, 94 S.Ct.

2315, 41 L.Ed.2d 141 (No. 72–1490) (June 10, 1974).

Slip Op. at 2.

Here, the price of aviation fuel is limited by an ascertainable "maximum lawful price" or a ceiling price. That a specific price charged below that ceiling may be determined in part by market forces, particularly in light of the holding in *Consumers Union* that price determinations made entirely by a free market comply with the EPAA, neither creates an "exemption" in violation of § 4(g)(2) of the Act, 15 U.S.C. § 753(g)(2), nor contravenes the requirements of § 4(a) of the Act, 15 U.S.C. § 753(a).

■■■ In their opening memorandum of points and authorities, plaintiffs raise a further issue. There, at page 33, they infer that indirect regulation is impermissible. Specifically, they state:

As this Court of Appeals told the FPC:

"Indirect 'regulation' . . . is worse than an exemption simpliciter. Such an approach retains the false illusion that a government agency is keeping watch over rates, pursuant to the statute's mandate, when it is in fact doing nothing."

Texaco, Inc. v. FPC, [154 U.S.App.D. C. 168] 474 F.2d 416 (D.C.Cir. 1973) vacated and remanded, [417 U.S. 380, 94 S.Ct. 2315, 41 L.Ed.2d 141] 42 U.S. L.W. 4867 (June 10, 1974).

Whatever comfort plaintiffs may have derived from this portion of the Court of Appeals' decision, however, was short-lived as this reasoning was specifically rejected by the Supreme Court:

We face first the issue as to the validity of indirect regulation of small producer rates: on the assumption that Order 428 allows pipelines and large producers to reflect in their rates only just and reasonable charges

for gas purchased from small producers, is the order valid? *We hold that it is,* for we see nothing in the Act which requires the Commission to fix the rates chargeable by small producers by orders directly addressed to them and which proscribes the kind of indirect regulation undertaken here.

The Act directs that all producer rates be just and reasonable but it does not specify the means by which that regulatory prescription is to be attained. (emphasis added)

FPC v. Texaco, Inc., *supra,* 417 U.S. at 387, 94 S.Ct. at 2321. The Court further states, quoting from FPC v. Hope Natural Gas Co., 320 U.S. 591, 602, 64 S.Ct. 281, 88 L.Ed. 333 (1944): " 'Under the statutory standard of "just and reasonable" it is the result reached not the method employed which is controlling.' " 417 U.S. at 388, 94 S.Ct. at 2322.

This Court thus concludes that the regulation, although employing indirection and allowing market mechanisms to come into play, does not impermissibly overstep the administrative authority delegated FEA by Congress in the EPAA.

■■■ Plaintiffs final challenge is hurled at the cost carryover and banking provisions of the regulations as they are applied to aviation fuel. 10 C.F.R. § 212.83(d); *see* FEO Ruling 1974–12, 39 Fed.Reg. 1823 (May 28, 1974); TWA v. FEO, *supra,* 380 at F.Supp. 560.[5] Plaintiffs allege this process violates the provisions of the EPAA in two ways. First, regardless of the benefits a supplier may derive from long-term contracts, the regulations allegedly shift the burden of any contract price limitations from the supplier to non-contract customers. This, plaintiffs assert, issues an otherwise unavailable "insurance policy" to refiners and therefore fails to minimize "unnecessary interference with

---

5. As noted above, the FEA, by emergency regulation, modified in part this portion of the regulation. 39 Fed.Reg. 32306 et seq. (September 5, 1974). However, although exhibiting an awareness of the marketplace, this modification does not fully cure the ills complained of by plaintiffs as it does not affect costs "banked" as a result of contracts entered into on or before its September 1, 1974 effective date.

market mechanisms" as required by § 4(b)(1)(I) of the Act, 15 U.S.C. § 753(b)(1)(I). Second, FEA's banking rules allegedly encourage suppliers to take advantage of isolated vulnerabilities caused by purchasers without substantial contract price protection thereby failing to promote "equitable prices among all regions and areas of the United States . . . and among all users." EPAA § 4(b)(1)(F), 15 U.S.C. § 753(b)(1)(F).

FEA justifies its banking rule under Section 4(b)(2)(A) of the Act, 15 U.S. C. § 753(b)(2)(A), which states that the price control regulations shall provide for "a dollar-for-dollar passthrough of net increases in cost of crude oil, residual fuel oil, and refined petroleum products to all marketers or distributors *at the retail level.*" (emphasis added) It further justifies its banking rule by citing the need to reconcile the objectives of "equitable prices" with the need to provide sufficient economic inducements to increase supplies of crude oil and refined petroleum products.

In considering the dollar-for-dollar passthrough of net increases in the cost of crude oil and refined petroleum products to all marketers or distributors at the retail level, it is necessary to understand that ATA and NACA members being ultimate consumers deal directly with refiners, thereby entering into transactions at the retail level. Thus, the dollar-for-dollar protection afforded by the Act is applicable to the refiners' sale of aviation fuel to the aviation industry.

Plaintiffs urge a contrary interpretation of the Act. The Conference Report contains no specific discussion of the dollar-for-dollar passthrough. It does, however, indicate that this portion of the EPAA was adopted from the House version, with a change making the House provisions applicable to residual fuel oil. Conf.Rep., *supra* at p. 2702. Thus, in arguing that the dollar-for-dollar provision is not applicable to the pricing of aviation fuel, plaintiffs cite the following language of the report of the Interstate and Foreign Commerce Committee which accompanied the House bill:

Paragraph (2) of subsection (b) specifies that the pricing controls contained in the regulation issued by the President shall provide for a dollar-for-dollar passthrough of net increases in the cost of gasoline and refined lubricating oils at the retail level . . . . The provisions contained in subsection (b)(2) would assure that, in exercising his authority under this bill, the President would not repeat similar inequities in the establishment of prices or methods for determining prices for gasoline and refined lubricating oil.

House Rep., *supra* at pp. 2596–2597. Plaintiffs' reliance on this language, however, is unfounded. First, while the House Report mentions only price increases in gasoline, refined lubricating oils, and heating oil, the statutory language includes crude oil, residual fuel oil and refined petroleum products. "Refined petroleum products" are defined as "gasoline, kerosene, distillates (including Number 2 fuel oil), LPG, refined lubricating oils, or diesel fuel." EPAA § 3(5), 15 U.S.C. § 752(5). Furthermore, the Conference Committee considered "the term 'kerosene' to also encompass jet fuel . . . ." Conf.Rep., *supra* at p. 2693. More importantly, while the Congress specifically directed its attention to insuring a dollar-for-dollar passthrough and the use of the same date for computations, it was silent with respect to other provisions of the contemporaneous Cost of Living Council regulations[6] which have been adopted by

6. The Cost of Living Council Phase IV price regulations defined "refiner" as "a firm . . . which refines covered products or blends and substantially changes covered

the FEA and which plaintiffs now seek to challenge.[7] The two directives of section 4(b)(2) of the Act[8] are the only direct revisions in the Phase IV price controls ordered by Congress. The other provisions were permitted to continue "unless and until required to be modified" to conform with the Act, with such a determination left to the discretion of the Administrator. Thus, providing refiners a dollar-for-dollar passthrough in the retail sales of jet fuel to aviation consumers is, at the very least, permissible if, indeed, it is not mandated by the language and legislative history of Section 4(b)(2)(A) of the EPAA.

■ FEA's second statutory justification likewise appears sound and, conversely, plaintiffs' reliance on the identical statutory provision appears unfounded. Both parties refer to the "equitable price" provisions of Section 4(b)(1)(F), 15 U.S.C. § 753(b)(1)(F). The Conference Report makes clear that the reference to "equitable prices" relates not only to the relationship among all users but also to the one between suppliers and purchasers. The Report states:

> The reference to equitable prices in the bill is specifically intended to em-

phasize that one of the objectives of the mandatory allocation program is to prevent price gouging or price discrimination which might otherwise occur on the basis of current shortages. On the other hand, it is contemplated that prices for allocated fuels will be set at levels or pursuant to methods which will permit adequate compensation to assure that private property is not implicitly confiscated by the government.

Conf.Rep., *supra* at pp. 2702–2703. Moreover, the Conference Committee recognized the need for balancing incentives for production with increased costs to consumers:

> Most importantly, the President must, in exercising this authority, strike an equitable balance between the sometimes conflicting needs of providing adequate inducement for the production of an adequate supply of product and of holding down spiraling consumer costs.

*Id.* at p. 2703. Finally, these goals, as noted earlier, need only be achieved to the maximum extent practicable.

---

products . . . and sells those products to resellers, retailers, reseller-retailers or *ultimate consumers* . . . ." (emphasis added) 6 C.F.R. § 150.352 (1973). They further defined "retail sales" as "sales of covered products to ultimate consumers." *Id.* These definitions have been adopted in the present FEA price regulations. 10 C.F.R. § 212.31, 39 Fed.Reg. 1951 (Jan. 15, 1974).

7. The Conference Report, *supra* at p. 2702, states:
. . . that the pricing controls called for in this legislation may, in those circumstances where pricing controls, established pursuant to other federal authority are consistent with the requirements and objectives of this Act, merely confirm those controls in the regulation to be promulgated under authority of section 4 of this Act. It is expressly contemplated, for example, that the price controls established by Phase

IV under authority of the Economic Stabilization Act would continue in effect unless and until required to be modified by the price regulation required to carry out the purposes of this Act.

8. Section 4(b)(2) of the Act, 15 U.S.C. § 753(b)(2) provides:
In specifying prices (or prescribing the manner for determining them), such regulation shall provide for—
(A) a dollar-for-dollar passthrough of net increases in the cost of crude oil, residual fuel oil, and refined petroleum products to all marketers or distributors at the retail level; and
(B) the use of the same date in the computation of markup, margin, and posted price for all marketers or distributors of crude oil, residual fuel oil and refined petroleum products at all levels of marketing and distribution.

Plaintiffs' last argument, that the banking rules create an "unnecessary interference with market mechanisms" in violation of § 4(b)(1)(I) of the Act, 15 U.S.C. § 753(b)(1)(I), is likewise unpersuasive as it urges the complete accomplishment of one goal of the Act to the exclusion of the other eight. *See* Union Oil Co. v. FEA, *supra,* Slip Op. at 5–6.

This Court thus concludes that the FEA has acted within its authority under the EPAA in promulgating regulations which provide for both "special product" and "other than special products" classifications and cost carryovers and in applying these regulations to the sale of aviation fuel.

## V. THE FEA PRICE REGULATIONS ARE NEITHER ARBITRARY, CAPRICIOUS NOR OTHERWISE UNLAWFUL

The final issue requiring resolution is whether the FEA has acted arbitrarily and capriciously or has otherwise engaged in unlawful discrimination. The test is whether the challenged agency action is without a rational or reasonable basis. American Nursing Home Assoc. v. Cost of Living Council, 497 F.2d 909, 913 (Em.App.1974); Dell Publishing Co. v. Summerfield, 198 F.Supp. 843, 844 (D.D.C.1961), aff'd, 113 U.S.App.D.C. 1, 303 F.2d 766 (1962). A regulation may not be overturned merely because one segment of a regulated class suffers economic losses not shared by others. Bowles v. Willingham, *supra,* 321 U.S. at 518–519, 64 S.Ct. 641, 88 L. Ed. 892, TWA v. FEO, *supra,* 360 F. Supp. at 568. Moreover, the party attacking the regulatory scheme carries the burden of persuasion. American Nursing Home Assoc. v. Cost of Living Council, *supra;* Pacific Coast Meat Jobbers Assoc. v. Cost of Living Council, *supra.*

The Court, having considered the challenged regulations and their application here, finds those regulations to have a rational basis. Plaintiffs have failed to satisfy their burden of persuading this Court otherwise.