**TRANS WORLD AIRLINES, INC.,**
Plaintiff,

v.

**FEDERAL ENERGY OFFICE and John
C. Sawhill, Administrator Federal
Energy Office, Defendants.**

Civ. A. No. 74–732.

United States District Court,
District of Columbia.

July 29, 1974.

561

Edward C. McLean, Jr., New York City, Edmund E. Harvey, Washington, D. C., for plaintiff.

Winston E. Miller, Dept. of Justice, Washington, D. C., for defendants.

## MEMORANDUM AND ORDER

### A.  *The Parties*

CORCORAN, District Judge.

The plaintiff, Trans World Airlines, Inc. ("TWA") is an air carrier operating under certificate of public convenience and necessity issued by the Civil Aeronautics Board pursuant to Section 401 of the Federal Aviation Act of 1958 (49 U.S.C. § 1371).

The defendant Federal Energy Office ("FEO") was established by Executive Order No. 11748 of December 4, 1973, (38 Fed.Reg. 33575).  Under that Order the President delegated to the Administrator of FEO (i) all the authority vested in the President by the Emergency Petroleum Allocation Act of 1973, Pub.L. No. 93–159, 87 Stat. 627, 15 U.S.C. § 751 *et seq.* ("Petroleum Act");  (ii) all the authority vested in the President by Section 203(a)(3) of the Economic

**562**

Stabilization Act of 1970, *as amended* (12 U.S.C. § 1904 note) ("Stabilization Act"); and (iii) the authority vested in the President by the Defense Production Act of 1950, *as amended* (50 U.S.C.App. § 2061 *et seq.*), insofar as it relates to the production, conservation, use, control, distribution and allocation of energy. The Executive Order further directed the Cost of Living Council to delegate certain of its authority under the Stabilization Act to the Administrator of FEO. On December 26, 1973, the Cost of Living Council delegated to FEO the authority to administer the petroleum pricing regulations issued under the Stabilization Act (Cost of Living Council Order No. 47, December 26, 1973).

The defendant John C. Sawhill is the Administrator of FEO.

### B. *The Nature of the Action*

This action arises under the Petroleum Act and involves the interpretation and validity of regulations promulgated by FEO effective January 14, 1974 with respect to the pricing of aviation fuel (10 C.F.R., Part 210, and Part 212; 39 Fed.Reg. 1924, *et seq.*)

TWA challenges the FEO pricing regulations insofar as they relate to so-called "domestic fuel" used principally on flights within the United States (as distinguished from so-called "bonded fuel" used principally on international flights). TWA seeks preliminary and permanent injunctive relief against the enforcement of such regulations.[1]

### C. *The Petroleum Act*

In November of 1973, Congress determined that "a national energy crisis" existed and enacted the Petroleum Act to cope with it.

Congress declared:

The purpose of this Act is to grant to the President of the United States and direct him to exercise specific temporary authority to deal with shortages of crude oil, residual fuel oil, and refined petroleum products or dislocations in their national distribution system. The authority granted under this Act shall be excerised for the purpose of minimizing the adverse impacts of such shortages or dislocations on the American people and the domestic economy. 15 U.S.C. § 751(b).

The President was given 15 days to promulgate regulations providing for the mandatory allocation of crude oil, residual fuel oil and refined petroleum products in amounts and at prices to be specified in the regulations [15 U.S.C. § 753(a)].

To the extent here relevant, the regulations were to achieve, to the maximum extent practicable, each of the following objectives:

(A) protection of public health, safety, and welfare (including maintenance of residential heating, such as individual homes, apartments, and similar occupied dwelling units), and the national defense;

(B) maintenance of all public services (including facilities and services provided by municipally, cooperatively, or investor owned utilities or by any State or local government or authority, and including transportation facilities and services which serve the public at large);

---

1. TWA ultimately seeks a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 that the FEO regulations are invalid as applied to TWA in that they are arbitrary and capricious, contrary to the Congressional mandates in the Economic Stabilization Act of 1970 and the Emergency Petroleum Allocation Act of 1973 and otherwise unlawful under the criteria set forth in 5 U.S.C. § 706(2). TWA also seeks relief on the grounds that the FEO regulations as applied to TWA deny

TWA substantive due process contrary to the Fifth Amendment of the Constitution of the United States, and asks the Court, if it is necessary to reach this issue, to determine that a "substantial constitutional issue" exists which should be certified to the Temporary Emergency Court of Appeals pursuant to Section 211(c) of the Stabilization Act which is incorporated by reference in the Petroleum Act.

(C) maintenance of agricultural operations, including farming, ranching, dairy, and fishing activities, and services directly related thereto;

(D) preservation of an economically sound and competitive petroleum industry; including the priority needs to restore and foster competition in the producing, refining, distribution, marketing, and petrochemical sectors of such industry, and to preserve the competitive viability of independent refiners, small refiners, nonbranded independent marketers, and branded independent marketers;

(E) the allocation of suitable types, grades, and quality of crude oil to refineries in the United States to permit such refineries to operate at full capacity;

(F) equitable distribution of crude oil, residual fuel oil, and refined petroleum products at equitable prices among all regions and areas of the United States and sectors of the petroleum industry, including independent refiners, small refiners, nonbranded independent marketers, branded independent marketers, and among all users;

(G) allocation of residual fuel oil and refined petroleum products in such among all regions and areas of the necessary for the maintenance of exploration for, and production or extraction of, fuels, and for required transportation related thereto;

(H) economic efficiency; and

(I) minimization of economic distortion, inflexibility, and unnecessary interference with market mechanisms. § 4(b)(1), 15 U.S.C. § 753(b)(1).

Section 4(b)(2), 15 U.S.C. § 753(b)(2), further provided that in specifying prices (or in prescribing the manner for determining them) FEO must provide for the use of a single date in computing the base prices of crude oil, residual fuel oil, and refined petroleum products at all levels of marketing and distribution, and that FEO must provide a dollar-for-dollar passthrough of net increased product costs to all marketers and distributors at the retail level.

Important to a consideration of the case at hand is the further statutory provision that "There shall be available as a defense to any action brought . . . for breach of contract . . . arising out of delay or failure to provide, sell, or offer for sale or exchange crude oil, residual fuel oil, or any refined petroleum product, that such delay or failure was caused solely by compliance with the provisions of this chapter or with the regulation or any order under section 753 of this title." Section 6(c)(5), 15 U.S.C. § 755(c)(5). This language is recognized as authority for the FEO to preempt any contract the terms of which might undercut the effectuation of FEO policy. See H.R.Conf.Rep.No. 628, 93d Cong., 1st Sess. 24 (1973). It has been carried over into the FEO regulations. 10 C.F.R. §§ 212.82(a) and (f); 10 C.F.R. § 210.77. See also Affidavit of defendant Sawhill, at 12–13.

D. *The FEO Pricing Regulations*

The FEO pricing regulations provide so far as is here relevant, that refiners may not charge to any class of purchaser a price in excess of a maximum lawful price, which is the "base price" plus the refiner's "increased product costs" incurred since May 15, 1973. The base price is the weighted average price at which the item was lawfully priced on May 15, 1973.

"Increased product costs," is the increased cost of crude to the refiner over and above the price paid for it in May, 1973. In allocating such increased costs to various products a distinction is made in the FEO regulations between "special products" and "other than special products." [10 C.F.R., § 212.83(c)].

Aviation fuel is classified as an "other than special product" and for purposes of simplification we shall hereinafter deal only with the effect of such classification on aviation fuel as such.

Under the regulations, a refiner is permitted to increase the May 15, 1973, price of aviation fuel by apportioning the

**564**

total amount of its increased costs in whatever amount the refiner deems appropriate, provided however that the amount of such increase is "equally applied to each class of purchaser." [10 C.F.R. § 212.83(c)(ii)].

A "class of purchaser" is defined in the pricing regulations to mean "purchasers or lessees to whom a person has charged a comparable price for comparable property or service pursuant to customary price differentials between those purchasers or lessees and other purchasers or lessees" 10 C.F.R. § 212.31. The ten domestic trunkline air carriers, including TWA and its principal competitors, American Airlines and United Air Lines, are members of the same "class of purchaser" as defined in the regulations.

If, under its pricing system, the refiner fails in any given month to recoup the entire amount of its increased costs of aviation fuel, the amount not recouped may be carried forward to a subsequent month and added to the May 15, 1973 selling prices of all "other than special products"—including aviation fuel—to compute base prices for that month "provided that the amount of the increased product cost not recouped and included in computing the base prices of a particular covered product (aviation fuel) is equally applied to each class of purchaser." 10 C.F.R. § 212.83(d)(2). This is known as "banking."

### E. *Application and Interpretation of the Regulations*

Approximately 75 percent of the aviation fuel sold to the eleven domestic trunkline carriers (including TWA) is under fixed price contract. However, TWA, by reason of the expiration of earlier contracts, presently purchases roughly only 44% of its fuel by contract.

To the extent air carriers happen to have contracts for domestic aviation fuel with the 1972 suppliers with whom they are required to deal by the FEO, which contracts provide for prices lower than the maximum prices which a refiner is permitted to charge under the FEO reg-

ulations, the FEO has not overridden such contract prices, although as noted above it has the power to preempt those contracts to effectuate its mandate.

To interpret and clarify the complex regulations which govern the pricing of aviation fuel the FEO on May 21, 1974, issued its Ruling 1974–12, 39 Fed.Reg. 18423.

Ruling 1974–12 sets forth a hypothetical set of facts under which Firm A, a refiner, sells jet fuel to Firm X and Firm Y, both air carriers. The May 15, 1973, lawful price to both carriers was $.20 per gallon and it is assumed that A has a private contract with X containing a ceiling price of $.25 per gallon but does not have such contract with Y. It is further assumed that A allocates "increased product costs" of $.17 per gallon to be used in computing jet fuel prices in April, 1974. During April, A therefore charges X only $.05 per gallon above the May 15, 1973 price since the contract ceiling is $.25 per gallon, and charges Y $.17 per gallon above the May 15, 1973 price or $.37 per gallon. The FEO Ruling approves this practice as "equal application" of increased costs notwithstanding the fact that in April Y has had to pay a $.17 increase and X has only had to pay a $.05 increase.

The Ruling goes on to state that A, who has not charged and therefore not recovered $.12 per gallon of increased costs from X in April, may "bank" such costs and carry them forward to the following month when he may again pass them through to purchasers of his products. The example assumes that X has a total of $60,000 of such unrecouped or "banked" costs for April which may be carried forward to May. While the Ruling states (p. 3) that such costs "need not be assigned to jet fuel in computing base prices for a subsequent month," it does not prohibit the assigning of such costs to jet fuel. To the extent they are assigned to jet fuel, carrier Y, without a contract, will have to pay more than $.37 per gallon even if there are no further increases in the cost of crude oil.

Carrier Y will thus have to bear an even larger share of the increased costs compared with carrier X, which will still be charged no more than $.25 per gallon as it paid in April, due to the fact that X has a contract with price protection provisions.

## F. *Discussion*

As noted above, TWA purchases roughly 44% of its fuel under contract while the average contract purchase of all trunklines is 75%. TWA claims that under the regulatory pricing scheme set out above, its average weighted fuel cost for the first quarter of 1974 was about 2½ cents per gallon above the average of all trunkline carriers, thus putting it at a disadvantage in competition with other trunk carriers.

TWA points particularly to Section 4(b)(1)(F) of the Petroleum Act which requires "equitable distribution of crude oil, residual fuel oil, and refined petroleum products *at equitable prices* among all regions and areas of the United States and sectors of the petroleum industry, including independent refiners, small refiners, nonbranded independent marketers, branded independent marketers, and among all users." (Emphasis added.)

In a nutshell TWA contends that when Congress mandated "equitable prices" to all users it intended that the added costs passed through by the refiners to a class of users would be equally borne by all users in that class even though the assessment of such added costs against a contract purchaser might result in a price in excess of the contract price. FEO, on the other hand, denies that there is any support in the Petroleum Act or its legislative history for the "equal prices" theory, and asserts that its regulations and their application are consistent with congressional intent and are designed to satisfy the mandate of Section 4(b)(1)(I), that there be a minimum of economic distortion and that there be no unnecessary interference

with market mechanisms in carrying out the Act.

■ The scope of the review by this Court is, of course, limited to determining whether the FEO regulations are in accord with its authority, are arbitrary or capricious or otherwise unlawful under 5 U.S.C. § 706(2). Pacific Coast Meat Job Ass'n Inc. v. Cost of Living Council, 481 F.2d 1388, 1391–1392 (Em. App.1973), and whether there is a rational basis for the interpretation and application of these regulations.

We conclude that the regulation meets all the required standards and that the interpretation and application thereof by the FEO has a rational basis. *Cf.* Exxon Corp. v. Federal Energy Office, C.A. No. 74–921 (D.D.C., July 17, 1974).

■ Section 4(b)(1)(I) of the Petroleum Act requires that FEO regulations provide for "minimization of economic distortion, inflexibility, and unnecessary interference with market mechanisms," to the maximum extent practicable; and the legislative history makes clear that Congress intended that contracts should be preempted only if FEO determines that such preemption is necessary to accomplish the objectives of the Act. The Conference Report is clear on this point.

It is the intent of this legislation that economic distortion and interference be minimized to the extent practicable. The President should assure himself that his actions interrupt existing supply mechanisms only when necessary to permit the accomplishment of the objectives stated in subsection (4). Moreover, while it is expressly recognized and intended that the allocation program would have the effect of abrogating contracts for the supply of fuels covered by the regulation, *such abrogation should occur only to the extent necessary to accomplish the objectives of the Act. It is expected that the President's regulation will in most cases merely confirm existing supply relationships.* H.R.Conf.Rep. No. 628, 93rd Cong., 1st Sess. 24 (1973),

U.S.Code Cong. & Admin.News 1973, pp. 2582, 2701. (Emphasis added)

A colloquy on the floor of the House between Mr. MacDonald, author of the House version of the Petroleum Act, H.R. 9681, and Congressman Adams, made specific reference to the need to safeguard contract rights in the transportation sector.

> Mr. Adams. I should like to ask the author of the amendment, the subcommittee chairman, a question. On page 12 of the bill it provides for maintenance of all public services. I notice the amendment, which I support, provides in effect for a passthrough dollar-for-dollar only, so that there will not be price gouging.
>
> Under the bill, under these two sections, with respect to preexisting contracts for entities such as hospitals, public transportation units, local governments—the ones grouped as (A), (B), (C)—set forth in the report on pages 12 and 13, I understand it is the *intent of the report and of the committee that this regulatory program would keep in effect the presently existing contracts to the greatest degree possible, in other words that those contracts would not automatically be abrogated* . . . .
>
> Mr. MacDonald. That is correct.
>
> Mr. Adams. Another thing that is provided in the bill is equitable pricing, and that ties to the amendment on passthrough.
>
> Am I correct that it is the intent of the committee to prevent there being excessive or unfair prices during this period of time when we are having to allocate these things, and that *the prices set forth in these preexisting contracts for these public services, including public transportation, hospitals and other things listed in the committee report, to the maximum extent possible would remain valid?*
>
> Mr. MacDonald. *That is correct.*

119 Cong.Rec. 9129–30 (daily ed., Oct. 16, 1973). (Emphasis added).

Although Section 4(b)(1)(F), 15 U.S.C. § 753(b)(1)(F), provides that the regulations shall provide for "equitable prices" to the maximum extent practicable, there is nothing in the Act or the legislative history which indicates that "equitable prices" means "equal prices" as suggested by TWA. In fact, the legislative history indicates that the regulations governing the prices of petroleum products should not set specific prices for each product but rather that the regulations should only prescribe the manner in which prices should be determined. The Conference Report states:

> It is not intended, however, that the pricing authority be exercised by establishing specific prices for products at each level in the distribution system. For example, the regulation could merely state an equitable method for determining price levels, such as permitting a specified percentage markup of base costs. H.R.Conf.Rep. No.628, 93d Cong., 1st Sess. 25 (1973), U.S.Code Cong. & Admin.News 1973, p. 2702.

Consistent with the statutory language and the legislative history of the Petroleum Act, and the congressional objective of minimizing "unnecessary interference with market mechanisms" [Section 4(b)(1)(I)], FEO regulations preempt or override contracts only to the extent that compliance with existing contracts would constitute a violation of the mandatory pricing regulations. The price regulations do not preclude the selling of a product below the maximum lawful selling price. Thus, if a supplier and purchaser have a current contract which is consistent with the 1972 base period supplier/purchaser relationship, the price provisions of that contract are allowed to operate so long as the contract price does not exceed the maximum lawful price. *See* 10 C.F.R. § 212.82 and § 212.83.

The concept of establishing "maximum lawful prices" in administering price controls is not new. It has been judicially approved on numerous occasions in

cases arising under price control programs of World War II, and the Korean War. Consistent with this concept of maximum prices FEO regulations do not abrogate contracts which provide for prices below the maximum lawful price. Moreover, Section 4(b)(1)(I) of the Petroleum Act and its legislative history make plain that Congress intended that existing contracts be preserved to the maximum extent practicable.

In Pacific Coast Meat Jobbers Ass'n v. Cost of Living Council, *supra,* 481 F.2d at 1391, the court dealt with an allegation very similar to TWA's contention that the regulations must be irrational because they do not insure perfect compliance with all the objectives of the Petroleum Act:

Plaintiffs argue further that the C.L.C. actions being challenged were contrary to §§ 203(b)(1), (2), and (5) of the Act, which generally require the C.L.C. to act fairly and equitably and prevent hardships, market disruptions, and shortages. They allege that since disruptions and shortages are obviously occurring, the C.L.C. must be found to have acted in disregard of these sections of the Act. The obvious answer to this argument is that complete success, or complete fairness, is neither possible nor required in this kind of administrative action. In order for this court to affirm the C.L.C. action and the court below, it is not necessary that we decide that the C.L.C.'s action was:

. . . the only reasonable [method], or even that this Court would have reached the same result if the question had arisen in the first instance in judicial proceedings. Unemployment Comm'n v. Aragon, 329 U.S. 143, 153, 67 S.Ct. 245, 91 L.Ed. 136 (1946), Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965), Udall v. Washington, Virginia and Maryland Coach Co., 130 U.S.App.D.C. 171, 175, 398 F.2d 765, 769, *cert. denied,* Washington Metropolitan Area

Transit Com. v. United States, 393 U.S. 1017, 89 S.Ct. 620, 21 L.Ed.2d 561.

In a case such as this the "judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body." Miss. Valley Barge Co. v. United States, 292 U.S. 282, 286–287, 54 S.Ct. 692, 694, 78 L.Ed. 1260 (1934), Udall v. Washington, Va.. and Md. Coach Co., id. [Jennings v. Schultz, 355 F.Supp. 1198 (D.D.C.1972)].

■■ Granted that the FEO might have devised another method of managing the required passthrough of a refiner's costs to the air carriers, the Court cannot say that the regulations of the FEO and their application have no rational basis or that they are inconsistent with the congressional mandate. Nor can it be said that when the FEO was faced with seemingly inconsistent mandates, *i. e.,* to establish "equitable prices" and at the same time to minimize economic distortion and unnecessary interference with market mechanisms, it acted arbitrarily, capriciously or irrationally in placing the emphasis upon the maintenance of market mechanisms rather than construing equitable prices to mean equal prices. The Court may not substitute its judgment for that of the FEO.

■ In any situation where injunctive relief is sought, the applicant must satisfy each of the traditional criteria set out in Virginia Petroleum Jobbers Assn. v. Federal Power Commission, 104 U.S.App.D.C. 106, 110, 259 F.2d 921, 925 (1958): (a) that the applicant establish a substantial likelihood of success on the merits; (b) that without relief the applicant will suffer irreparable harm; (c) while at the same time convincing the Court that no substantial harm will result to the opposing party; and (d) that it is in the public interest to grant the relief. *Cf.* McGuire Shaft & Tunnell Corp. v. Local Union No. 1791, UMW, 475 F.2d 1209 (Em.App.), cert. denied, 412 U.S. 958, 93 S.Ct. 3008, 37 L.Ed.2d 1009 (1973). We need look only

at the first two requirements. In view of what is set out above we cannot find that TWA has made a substantial showing of likelihood of success on the merits. As to the claim of irreparable injury this Court is mindful that a federal regulation may not be enjoined on the ground that one segment of the regulated class suffers economic loss not shared by other class members. Bowles v. Willingham, 321 U.S. 503, 516–519, 64 S.Ct. 641, 88 L.Ed. 892 (1944). *But cf.* Sampson v. Murray, 415 U.S. 61, 90, 94 S. Ct. 937, 953, 39 L.Ed.2d 166 (Feb. 19, 1974).

## G.  CONCLUSIONS

1.  This Court has jurisdiction of this action under Section 5(a)(1) of the Emergency Petroleum Allocation Act, 15 U.S.C. § 754(a)(1), which incorporates by reference Sections 210 and 211 of the Economic Stabilization Act of 1970, as amended, 85 Stat. 743, 12 U.S.C. § 1904 note. This Court also has jurisdiction under 28 U.S.C. §§ 1331, 1337, 2201 & 2202.

2.  Venue in this district is proper under 28 U.S.C. § 1391(e).

3.  Plaintiff has exhausted its available administrative remedies. On March 27, 1974, TWA filed with FEO a complaint and request for remedial orders. Although FEO has made, to date, no formal response to TWA's complaint, by the issuance, however, of FEO Ruling 1974–12, on May 21, 1974, subsequent to the filing of the case at bar on May 14, 1974, FEO unequivocally conforms that it intends its regulations to be interpreted in the manner which TWA complains of in the present action.

Therefore, the exhaustion requirement has been met. There remain no factual disputes, but rather "only a legal question . . . concerning the *interpretation* of the validity of certain regulations in the light of the [relevant statutes]." American Nursing Home Association v. Cost of Living Council, 497 F.2d 909 at 913 (Em.App., April 29, 1974) (emphasis added). *See also* Consumers Union v. Cost of Living Council, 491 F.2d 1396 (Em.App.1974).

4.  Plaintiff has not met the requirements of Virginia Petroleum Jobbers Assn. v. Federal Power Co., *supra.*

## H.  ORDER

Accordingly, it is this 29th day of July, 1974,

Ordered that the motion of plaintiff TWA for a preliminary injunction be, and the same hereby is, denied.

\*    \*    \*    \*    \*    \*

The foregoing constitutes the Court's findings of fact and conclusions of law. Fed.R.Civ.P. 52(a).