EASTERN AIR LINES, INC.,
Plaintiff-Appellant/Cross-Appellee,

v.

ATLANTIC RICHFIELD COMPANY,
Defendant-Appellee/Cross-Appellant,

Richard W. Dyke, dba Western Stations Co., Colvin Oil Company and F.O. Fletcher, Inc., dba Fletcher Oil Company, Amici Curiae,

Ashland Oil Company of California, et al., Amici Curiae.

Nos. 11–2, 11–3.

Temporary Emergency Court of Appeals.

Argued April 14, 1983.

Decided June 15, 1983.

As Corrected July 5, 1983.

Rehearing and Rehearing En Banc Denied July 18, 1983.

Certiorari Denied Oct. 17, 1983.
See 104 S.Ct. 278.

James H. Bratton, Jr., Gambrell & Russell, Atlanta, Ga., with whom Donald L. Rickertsen and John G. Despriet, Atlanta, Ga., of the same firm and Laurence A. Schroeder, Walton, Lantaff, Schroeder & Carson, Miami, Fla., on brief for plaintiff-appellant/cross-appellee.

Robert E. Jordan, III, Steptoe & Johnson, Washington, D.C., with whom Richard H. Porter, F. Michael Kail, Samuel T. Perkins, Charles G. Cole, and Jeanne Davidson, Washington, D.C., of the same firm and John R. Lucas, Jr., Atlantic Richfield Co., Los Angeles, Cal., on brief for defendant-appellee/cross-appellant.

Neva T. Campbell, Schwabe, Williamson, Wyatt, Moore & Roberts, Portland, Or., on brief for Amici Curiae, Richard W. Dyke, dba Western Stations Co., Colvin Oil Co. and F.O. Fletcher, Inc., dba Fletcher Oil Co.

William H. Bode, Batzell, Nunn & Bode, Washington, D.C., with whom John E. Varnum and Tobey B. Marzouk, Washington, D.C., of the same firm on brief for Amici Curiae, Ashland Oil Co. of California, et al.

Before INGRAHAM, ESTES and BECKER, Judges.

ESTES and WILLIAM H. BECKER, Judges:

Eastern Air Lines, Inc. ("Eastern") filed suit against Atlantic Richfield Company ("ARCO") on September 19, 1974, to recover amounts allegedly resulting from overcharges in the sale of jet fuel from ARCO to Eastern at O'Hare field in Chicago from November 1, 1973 to October 24, 1974, and Love Field in Dallas from November 1, 1973 to January 12, 1974. ARCO was required to supply Eastern during this time pursuant to the Middle Distillate Fuel Allocation Program, 38 Fed.Reg. 28660, enacted under the authority of the Economic Stabilization Act of 1970, 12 U.S.C. § 1904 note ("ESA") and the Emergency Petroleum Allocation Act of 1973, 15 U.S.C. § 754(a) ("EPAA"). Partial summary judgment was granted to Eastern on May 1, 1981, by United States District Judge Alcee Hastings. R. 1248.[1] A motion to vacate the summary judgment order was filed by ARCO on May 7, 1981 (R. 1294) but was not acted upon before Judge Hastings removed himself from the case on October 12, 1981.

On December 17, 1981, the case was transferred to Judge Jacob Mishler, United States Senior District Judge for the Eastern District of New York, sitting by designation. R. 1613. By Order dated December 28, 1981 (R. 2767), followed by a well-reasoned decision filed on January 12, 1982

---

1. Judge Hastings's Memorandum of Opinion and Order entered on May 1, 1981 was virtually in haec verba from the proposed findings filed by Eastern on April 14, 1981. *United States v. El Paso Natural Gas Co.*, 376 U.S. 651, 656, 84 S.Ct. 1044, 1047 footnote 4, 12 L.Ed.2d 12; Wright, *The Law of Federal Courts*, 4th ed., pp. 646–651, 656; ARCO Br. at 6, FN 8–9; Appendix to ARCO Br. at Tab 1.

(R. 1675), Judge Mishler granted ARCO's motion to vacate Judge Hasting's partial summary judgment order of May 1, 1981. On February 16, 1982, the case was heard by Judge Mishler. R.Vols. 13–20. By Memorandum of Decision and Order dated October 29, 1982 (filed November 2, 1982), Judge Mishler awarded Eastern $179,160 in damages against ARCO. R. 2597.[2] Final Judgment was entered on November 24, 1982. Eastern filed a Notice of Appeal with this court on November 29, 1982. R. 2772. ARCO cross-appealed on December 22, 1982.

The issues on appeal are:

1. Whether Judge Mishler properly vacated the May 1, 1981 partial summary judgment order entered by Judge Hastings.

2. Whether the District Court properly determined Eastern's class of purchaser and May 15, 1973 price.

3. Whether the District Court properly disallowed retroactive reallocation of costs by ARCO and properly computed damages resulting from the reallocation.

4. Whether ARCO violated the equal application rule by passing through too large a share of increased costs to Eastern.

5. Whether the District Court properly denied an award of attorney's fees, treble damages, and prejudgment interest.

*Summary Judgment*

█ Eastern contends that because Judge Hastings found that ARCO did not raise any questions of material fact[3] before his partial summary judgment order was entered on May 1, 1981, the partial summary judgment may not be vacated by a suc-cessor judge except for the most "cogent reasons."[4] Since Judge Hastings's May 1, 1981 order did not dispose of all the issues in the case,[5] we find Judge Mishler's vacation of it squarely within the provisions of Federal Rule of Civil Procedure 54(b) which states in part:

> When more than one claim for relief is presented in an action, ... the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, ... is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.

The partial summary judgment order entered by Judge Hastings on May 1, 1981 clearly provided for future revisions[6] before becoming final and did not contain an express determination that there was no reason for delay or a direction for entry of final judgment provided in Rule 54(b). R. 01287. Therefore, Judge Mishler was fully justified in vacating the partial summary judgment order. This court need only evaluate whether Judge Mishler properly exercised his judgment and discretion "[h]aving in mind that one judge should not overrule another except for the most cogent reasons." *United States v. Desert Gold Mining Company,* 433 F.2d 713, 715 (9th Cir.1970).

We find that Judge Mishler took extraordinary care to explain his reasoned decision

---

**2.** The antitrust claims asserted by Eastern in its Complaint were severed by Order of the District Court on July 8, 1975 (Record at 19) which provided that the antitrust claims would be stayed for a second, later trial.

**3.** Judge Mishler found that "many factual questions exist" which were "extremely complex" and that summary judgment was therefore "inappropriate." Memorandum of Decision, January 12, 1982, Record at 01712, notes 2 and 4.

**4.** *United States v. Desert Gold Mining Company,* 433 F.2d 713, 715 (9th Cir.1970).

**5.** Judge Hastings's May 1, 1981 Order expressly reserved the issues of whether or not treble damages and attorney's fees should be awarded for later disposition. Record at 01287.

**6.** The Order entered on May 1, 1981, provided that interest on the amount of judgment would accrue at the rate of 6 percent from October 24, 1974 until the date of *final* judgment in the action. The same order provided for revision of the damage award after disposition of the remaining issues if necessary. Record at 01287.

to vacate the partial summary judgment order. Memorandum of Decision, January 12, 1982, R. 01675–01717. Judge Mishler found that Judge Hastings had made certain erroneous factual findings and legal conclusions based thereon.[7] While recognizing that the controlling regulations were susceptible to differing interpretations,[8] Judge Mishler found Judge Hastings had erred in his interpretation. "A determination by a second judge that the former presiding judge made erroneous rulings that will seriously prejudice a party provides a cogent reason to justify vacating the prior order." Memorandum of Decision, January 12, 1982, R. at 01678. Judge Mishler's Memorandum of Decision sets forth with specificity both his reasons for believing the prior order was in error as well as his determinations that genuine issues of material fact then existed.

*Class of Purchaser and May 15, 1973 Price*

[2] Eastern contests the District Court's finding that ARCO established a May 15, 1973 price of 12.89 cents per gallon and contends that ARCO actually set Eastern's price at 11.55 cents per gallon.[9] The "maximum allowable price" at which products covered by the regulations could be sold was "the weighted average price at which the covered product was lawfully priced in transactions with the class of purchaser concerned on May 15, 1973, ... plus (a) increased product costs and nonproduct costs incurred between the month of measurement and the month of May 1973...."

10 C.F.R. § 212.82. A "class of purchaser" is defined as "purchasers or lessees to whom a person has charged a comparable price for comparable property or service pursuant to customary price differentials between those purchasers or lessees and other purchasers or lessees." 10 C.F.R. § 212.31. In assigning purchasers to their respective classes of purchaser, a refiner may consider several factors to determine whether or not the transactions were similar enough to be classified together, such as "volume, grade, quality, location or type of purchaser, or a term or condition of delivery." 10 C.F.R. § 212.31.

Mr. Richard Morse, an in-house attorney for ARCO, made the determination that Eastern should be assigned to a class of purchaser with the Aviation Division of U.S. Steel. Mr. Morse testified that he considered location, volume, and other factors in concluding that Eastern more closely resembled the Aviation Division of U.S. Steel than any other purchaser of jet fuel from ARCO, and thus Eastern should have been placed in the same class of purchaser as the Aviation Division of U.S. Steel. Morse Tr. at 1362. The last purchase of jet fuel by the Aviation Division of U.S. Steel from ARCO on or before May 15, 1973, was on May 12, 1973 at a price of 12.89 cents per gallon [Joint Pre-Trial Stipulation ("JPS") Appendix A, p. 2; Defendant's Exhibit ("D.Ex.") 84], and ARCO billed Eastern throughout the relevant period at the 12.89 cents per gallon figure.

---

7. Memorandum of Decision, January 12, 1982. Record at 01678–79.

8. This court has previously noted the obvious complexity and "frequent correction, modification, change and clarifying rulings" of the applicable regulations in this case. *Longview Refining Co. v. Shore*, 554 F.2d 1006, 1023, 1024– 1062 (Em.App.1977), *cert. denied*, 434 U.S. 836, 98 S.Ct. 126, 54 L.Ed.2d 98 (1977). And, we have repeatedly warned that "fundamental fairness requires that the regulations be clear so that men of common intelligence need not guess at the meaning and differ as to the application." *Id.* at 1014, n. 20; *Standard Oil Co. v. Department of Energy*, 596 F.2d 1029, 1065, n. 87 (Em.App.1978), *reh. denied*, 1979, citing *Boyce Motor Lines v. United States*, 342 U.S. 337, 72 S.Ct. 329, 96 L.Ed. 367 (1952). At oral

argument, counsel for both parties also voiced their trouble with these regulations.

9. *See*, Eastern's Brief at 40–45. Eastern's argument appears to be that because a price of 11.55 cents per gallon appeared on an ARCO internal computer printout in 1975, and that this printout was later used as data by ARCO in recomputing recoveries in response to a Notice of Probable Violation (NOPV), ARCO therefore had previously made the determination that Eastern's base price was 11.55 cents. The record reflects that Mr. Richard Morse, in-house counsel for ARCO, wrote Mr. George Immoor, manager of fuel contracts and services for Eastern, on February 15, 1974 and plainly stated that Eastern's base price was 12.89 cents per gallon. See, Plaintiff's Trial Exhibit "PTE" 37.

Eastern's contention that its proper May 15, 1973 price was 11.55 cents per gallon is based on the fact that the last sale of jet fuel from ARCO to Eastern prior to May 15, 1973 was at 11.55 cents per gallon on January 31, 1973 pursuant to a sales contract between the parties which expired that day.[10] From that day forward Eastern was not a contract purchaser from ARCO. However, the regulations require that the parties have an "ongoing commercial relationship" on May 15, 1973, pursuant to which Eastern could be considered to have been a "present customer" of ARCO on that date before ARCO would be justified in using Eastern's last purchase before May 15, 1973 as a base price. *Pacific Supply Co-Op. v. Shell Oil Co.,* 697 F.2d 1084, 1088 (Em.App.1982), and authorities cited therein. Since it is evident that Eastern was not a present customer of ARCO on May 15, 1973, ARCO had to place Eastern in a class of purchaser which did contain present customers on May 15, 1973. *Pacific Supply Co-Op. v. Shell, supra,* at 1088.

Consequently, Mr. Morse assigned Eastern to a class of purchaser with the Aviation Division of U.S. Steel. "It is well settled that a seller's classification of its purchasers will not be overturned by the courts or federal agencies unless the classification is unreasonable." *Pacific Supply Co-Op. v. Shell, supra,* at 1089, *citing Naph-Sol Refining Co. v. Cities Service Oil Co.,* 495 F.Supp. 882, 891–92 (W.D.Mich.1980); *Champlin Petroleum Co.,* 4 DOE ¶ 80,101, at 80,523–24 (1979). The record reflects ARCO's consideration of the factors relevant to a classification of purchaser (Memorandum of Decision and Order, October 29, 1982, R. 02607–02611; Morse, Tr. at 1362), and we affirm the finding of Judge Mishler that the classification was not unreasonable.

Because ARCO was required to assign Eastern to a class of purchaser in existence on May 15, 1973, we find unpersuasive Eastern's argument that the 11.55 cents per gallon price for Eastern shown on an internal ARCO computer printout constituted a deliberate determination by ARCO of a base price for Eastern. See Plaintiff's Trial Exhibit ("PTE") 171. We agree with the District Court that the evidence at trial showed that the computer printout was not a true reflection of the base price set by ARCO for Eastern,[11] and it would be unauthorized and manifestly unfair for us to force ARCO to sell to Eastern at its contract price at termination on January 31,

10. The original supply contracts between ARCO and Eastern were entered into in April, 1969. These contracts expired by their own terms in January, 1973. JPS at ¶ 19, Record at 01732.

11. Judge Mishler found:

We also reject Eastern's assertion that ARCO actually made a determination that Eastern's May 15, 1973 price was 11.55 cents per gallon. Eastern relies on a single statement in the 1975 deposition testimony of Mr. William Shellem, who has been employed by ARCO since May 1974 as Manager of Government Compliance in Government Reports and Analysis Price Control. At the deposition, Shellem stated that he did not take part in the process of establishing May 1973 base prices, either before or after he joined the company. This fact was confirmed at trial by the testimony of Mr. Foster, for whom Mr. Shellem worked. (Foster Tr. at 1092–93.) However, when he was shown a computer printout dated April 18, 1975 which listed a price for Eastern of 11.55 cents, Mr. Shellem answered affirmatively when asked whether the 11.55 cents was the base price for Eastern.

At trial ARCO presented several witnesses who explained the meaning of the prices listed on the computer printout. The computer program was designed by Mr. Roger Husband, Systems Development Manager for ARCO, to provide the initial data for the development of base prices by identifying the transaction on or closest preceding May 15, 1973 for each ARCO customer. The 11.55 cent price represented a computer record of Eastern's last transaction with ARCO. The information was used in computing recoveries and did not reflect the price actually charged Eastern nor any judgment as to base price. The effect of the erroneous figure in computing recoveries was an overstatement of recoveries for jet fuel. (Deft's Memo at 27–32; Foster, Tr. at 1041–42, 1068–72, 1080–82, 1086, 1259–60, 1262, 1306; Morse, Tr. at 1331–32, 1350–51, 1353–56, 1357–59, 1368, 1397–98, 1425, 1482–83; Husband, Tr. at 1540–43; Deft's Exh. 59, 60, 61).

Memorandum of Decision and Order, October 29, 1982, Record at 02649–50, Note 4.

1973, because of its continually rising product costs before and after January 31, 1973.

*Retroactive Reallocation*

[3] Eastern was awarded $179,160 in the District Court representing overcharges incurred because the court found that ARCO improperly retroactively reallocated banked costs to its other covered products bank in 1977 and 1979 to compensate for increased recoveries which were required to be retroactively realized by a succession of administrative rulings.[12] The challenged retroactive reallocations of costs in this case from the gasoline to other covered products banks total $70.3 million (PTE 1001, Chart B–1), and were reported by ARCO in 1977 and 1979 in its required refilings of FEO–96 forms showing recoveries on all covered products.[13] D.Ex. 123–134; PTE 126–137.

The District Court principally based its decision, that ARCO had impermissibly retroactively reallocated costs, on an administrative decision, *Tenneco Oil Co.,* 1 DOE (CCH) ¶ 82,512 (1977). Tenneco challenged a Remedial Order issued by the Federal Energy Office ("FEO") requiring the refund of over $12 million in overcharges on gasoline, asserting that during the relevant period it had available increased costs in its general refinery products bank which could have been reallocated to justify the price it charged for gasoline. The FEO stated simply: "This type of retroactive reallocation of increased costs to offset *overrecoveries* on a particular covered product has never been permitted under the price regulations." 1 DOE at 85,043. ARCO attempts to distinguish the *Tenneco* case by stating that it was Tenneco's reallocation of costs to compensate for an overrecovery of a particular product (gasoline) which was impermissible, whereas ARCO had reallocated its costs to the entire other covered products bank, in which the refiner was afforded his choice of which products would bear the increased prices. ARCO Br. at 31. We find the distinctions of *Tenneco* to be unpersuasive and agree with the decision of the District Judge that the retroactive reallocation of costs attempted by ARCO in this case was disallowed by the regulations.[14]

ARCO has argued that reallocation of costs was a permitted practice as evidenced by the fact that refilings of FEO–96 forms had previously been allowed by the agency. We agree with ARCO that the Preamble to 10 C.F.R. § 212.126(d), 44 Fed.Reg. 14,534 (March 13, 1979), reprinted in Regulations Preambles, *Energy Management* (CCH) ¶ 40,413, was intended to explain the new rule setting a firm deadline for all future refilings of FEO–96 forms. ARCO Reply Br. at 11.[15] While we recognize that refilings of FEO–96 forms were allowed, we

---

**12.** Judge Mishler discussed these various rulings and their effects on ARCO's recoveries in his October 29, 1982 Memorandum of Decision. Record at 02624–27.

**13.** ARCO first reported the effects of the administrative rulings in lump-sum adjustments to its FEO–96 forms for December 1974 through February 1975. Later in 1975, ARCO made an internal restatement of the data first reported in lump sums, reallocating it to previous months. At the same time, ARCO reallocated its recoveries. This data was used in the 1977 and 1979 refilings of ARCO's FEO–96 forms. *See* ARCO Br. at 26–27.

**14.** The reallocation attempted by ARCO required prior permission from the DOE. *See,* Preamble to 10 C.F.R. § 212.126(d), 44 Fed. Reg. 14,534 (March 13, 1979), reprinted in Regulations Preambles, *Energy Management* (CCH) ¶ 40,413.

**15.** Relevant portions of the Preamble to 10 C.F.R. § 212.126(d) stated:

"With respect to the type of revisions which may be made, a refiner will not be permitted to use the refiling procedures to circumvent DOE regulations or frustrate current DOE audits by, for example, reflecting arbitrary reallocation of costs in a prior period in order to avoid the consequences of an enforcement action. The allocation of costs to particular products in a particular month reflects the election of certain options by refiners provided for by the price rules. * * * The election of such allocation options, in turn, effect calculation of maximum allowable prices in subsequent months. Accordingly, in the absence of a final order or written permission from the Department, such reallocation of costs may not be reflected in the refilings of DOE cost allocation forms permitted during the one year period for refiling, or in the case of older forms, by June 1, 1979." *Preamble to* 10 C.F.R. § 212.126(d).

hold this type of retroactive reallocation of costs between product banks to compensate for overrecoveries was not ever permissible under the regulations, as illustrated by the decision in *Tenneco, supra.* (See, Memorandum of Decision and Order, October 29, 1982, R. at 02637, and *Naph-Sol Refining Co. v. Murphy Oil Corporation,* 550 F.Supp. 297, 313 (W.D.Mich.1982).)

█ Eastern contends that the damages awarded it on this issue should have totaled $946,108 rather than $179,160. Eastern Br. at 26. Eastern concedes that had ARCO made a refund of the overcharges resulting from the eventual disallowance of the retroactive reallocation of costs *at the time* the overcharges occurred, ARCO would only have had to refund $179,160. However, Eastern asserts, since the refund for overcharges is being made considerably after the fact, ARCO should now refund $946,108, even though the overcharges to Eastern never truly exceeded $179,160. Eastern Br. at 26.

The obvious fault in Eastern's reasoning appears to have been caused by its misinterpretation of how overrecoveries are stated on the FEO–96 forms. We agree with the District Court's finding that "each overrecovery is used to reduce the amount available for recovery in the succeeding month. Therefore, each month's overrecovery figure represents the *cumulative* overrecovery of the preceding period . . . ." Memorandum of Decision and Order, October 29, 1982, R. at 02638–02639. The overrecovery stated for October, 1974 of $26.9 million was the "cumulative overrecovery for the entire period." Memorandum of Decision and Order, October 29, 1982, R. at 02639. The $179,160 awarded Eastern is its proportionate share of the $26.9 million.

Eastern, however, added the overrecoveries from each month of the entire period resulting in a cumulative overrecovery of $143 million. See, PTE 1001, Chart B–1. The flaw in Eastern's method of computation, under which the $70.3 million disallowance of costs would yield $143 million in overrecoveries was aptly illustrated by an ARCO witness:

The way I try to put it in a simple fashion was, suppose I loan you a dollar a day for five consecutive days; a dollar on Monday, a dollar on Tuesday, a dollar on Wednesday, a dollar on Thursday, and a dollar on Friday.

At the end of the time, I wanted my money back. Using my methodology, you would owe me five dollars; one for each of the five days. Using Eastern's methodology, you would owe me a dollar for Monday, two dollars for Tuesday, three dollars for Wednesday, four dollars for Thursday, and five dollars for Friday; a total of fifteen dollars.

Lavin, Tr. at 1841.

We hold that the damages of $179,160 awarded Eastern because of ARCO's retroactive reallocation of its costs were correct.

*Equal Application*

█ Eastern asserts that it was charged an unequal share of the increased costs ARCO had available for pass-through during its period of purchase in violation of the "Equal Application Rule," which states in relevant part:

In computing base prices for a covered product other than a special product, a refiner may increase its May 15, 1973 selling price to each class of purchaser . . . by an amount to reflect the increased product costs . . . provide[d] that the amount of increased product costs included in computing base prices of a particular covered product other than a special product must be equally applied to each class of purchaser. In apportioning any amount of increased product costs to covered products other than special products, a refiner may apportion the total amount of increased product costs to a particular covered product other than a special product in whatever amount it deems appropriate.

10 C.F.R. § 212.83(c)(1)(ii), 39 Fed.Reg. 1924, 1955.

The District Court found that, on the average, Eastern was not charged a larger share of the increased costs available for recovery by ARCO than ARCO's other non-

contract jet fuel customers.[16] The parties stipulated both to ARCO's amount of recoveries and volumes sold to its non-contract jet fuel purchasers during the period (JPS ¶ 45 and Appendices D–G, R. 01741, 01756–59) and that ARCO had charged its contract jet fuel customers the maximum amount provided by their contracts, with minor clerical errors excepted. Additional Joint Pre-Trial Stipulation, R. 02259–02261; JPS ¶¶ 33–39, R. 01729.[17] The District Judge then utilized the stipulated data to conclude that on the average, ARCO recovered 19.9 cents per gallon from other non-contract jet fuel purchasers, but only 17.4 cents per gallon from Eastern (D.Ex. 199; Memorandum of Decision and Order, October 29, 1982, R. 02620) and therefore that Eastern had not been damaged in violation of the equal application rule.

However, Eastern was charged more than its equal share of increased costs during one month at O'Hare Field and two months at Love Field. D.Ex. 201. Judge Mishler determined that damages should not be assessed for those months in which Eastern was charged more than its share because in other months it was charged less than its share, resulting in a net pass-through to Eastern of less increased costs than ARCO would have been permitted to assess. Memorandum of Decision and Order, R. 02658–59.

Eastern cites *Kerr-McGee Corp.,* 3 F.E.A. (CCH) ¶ 83,179, *aff'd* 4 F.E.A. (CCH) ¶ 80,-577 (1976), as holding that the "overall" approach employed by Judge Mishler is not the proper standard for determining whether or not an equal application violation has

occurred. *Kerr-McGee* held that a firm may not offset a customer who was overcharged against one who was undercharged to prove that in the aggregate, its purchasers were not damaged by an equal application violation. 4 F.E.A. ¶ 80,577 at 80,827–28. By contrast, Judge Mishler offset *months* of overrecovery from a particular purchaser against months of underrecovery from the same purchaser. We conclude that the method employed by Judge Mishler represents a correct interpretation of the regulations and agree that Eastern was not damaged in violation of the Equal Application Rule because it bore less than its share of ARCO's increased product costs.

*PreJudgment Interest*

■ Judge Mishler denied the claim for prejudgment interest because he found Section 210 of the ESA provided that when an overcharge was unintentional, Congress had placed a specific limitation on the remedy which was not meant to be exceeded by prejudgment interest. Memorandum of Decision and Order, October 29, 1982, R. at 02664, n. 19. We agree with Judge Mishler that prejudgment interest is not available where the amount of damages claimed to be due is uncertain. *Belcher v. Birmingham National Bank,* 488 F.2d 474, 478 (5th Cir. 1973). At all times during this litigation it was evident that the amount claimed by Eastern was the subject of great uncertainty, and it would be inequitable and unjust to make such an award in this case.

*Attorney's Fees and Treble Damages*

■ We affirm the decision of the District Court to deny an award to Eastern of

**16.** Memorandum of Decision and Order, October 2, 1982. Record at 02620. Eastern also contends that ARCO failed to compute its maximum lawful price for Eastern by using the formula in the regulations, thus no valid assignment of increased costs to classes of purchasers was made. Failure to compute a maximum lawful price using the formula does not in and of itself result in an overcharge in violation of the regulations. *Longview Refining Co. v. Shore, supra,* 554 F.2d at 1017–18.

**17.** Purchasers of jet fuel with contracts setting a maximum lawful price are an exception to the rule that increased costs passed through to a product must be equally applied to each class

of purchaser; contract purchasers of jet fuel from ARCO were not required to pay more than their contract price under the equal application rule. FEO Ruling 1974–12, 3 F.E.G. (CCH) ¶ 16,022 (1974); *TransWorld Airlines, Inc. v. FEO,* 380 F.Supp. 560 (D.D.C.1974); *Air Transp. Ass'n of America v. FEO,* 382 F.Supp. 437 (D.D.C.1974), *aff'd,* 520 F.2d 1339 (Em. App.1975). Therefore, the District Court, after ascertaining that all contract purchasers were charged the maximum their contracts allowed, focused only on whether increased costs were passed through to each of ARCO's non-contract purchasers of jet fuel in equal amounts.

three times the amount of the overcharge and attorney's fees. In this connection we hold that the findings of the District Court, on which it based its decision to deny this award, were not only not clearly erroneous under Rule 52(a) F.R.Civ.P., but were fully warranted by the evidence. The District Court properly concluded that willfulness is used in § 210 in the criminal sense. *Longview Refining Company v. Shore,* 554 F.2d 1006, 1012–1014 (Em.App.1977), *cert. denied,* 434 U.S. 836, 98 S.Ct. 126, 54 L.Ed.2d 98. In *Evans v. Suntreat Growers & Shippers, Inc.,* 531 F.2d 568, 571 (Em.App.1976), this court upheld a district court's refusal to award attorney's fees and treble damages where "[t]he findings show lack of intent to violate the Act and support the part of the judgment refusing to allow attorney's fees or treble damages," citing *Manning v. University of Notre Dame Du Lac,* 484 F.2d 501 (Em.App.1973). Our conclusion is based on the following analysis of § 210 of the Economic Stabilization Act Amendments of 1971, 12 U.S.C. § 1904 note, and the review of the legislative history of § 210. The material part of § 210, in the current statute, enacted in 1971, appeared earlier in a Senate bill, S. 2891, from which it was taken.

*Analysis of § 210*

§ 210 of the Economic Stabilization Act Amendments of 1971, 12 U.S.C. § 1904 note, is as follows:

§ 210. *Suits for damages or other relief*

(a) Any person suffering legal wrong because of any act or practice arising out of this title, or any order or regulation issued pursuant thereto, may bring an action in a district court of the United States, without regard to the amount in controversy, for appropriate relief, including an action for a declaratory judgment, writ of injunction (subject to the limitations in section 211), and/or damages.

(b) In any action brought under subsection (a) against any person renting property or selling goods or services who is found to have overcharged the plain-

tiff, the court may, in its discretion, award the plaintiff reasonable attorney's fees and costs, plus whichever of the following sums is greater:

(1) an amount not more than three times the amount of the overcharge upon which the action is based, or

(2) not less than $100 or more than $1,000; except that in any case where the defendant establishes that the overcharge was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to the avoidance of such error the liability of the defendant shall be limited to the amount of the overcharge: *Provided,* That where the overcharge is not *willful* within the meaning of section 208(a) of this title, no action for an overcharge may be brought by or on behalf of any person unless such person has first presented to the seller or renter a bona fide claim for refund of the overcharge and has not received repayment of such overcharge within ninety days from the date of the presentation of such claim.

(c) For the purposes of this section, the term 'overcharge' means the amount by which the consideration for the rental of property or the sale of goods or services exceeds the applicable ceiling under regulations or orders issued under this title. (Emphasis of the word 'willful' is added.)

The word "willful" is used expressly only in the proviso of paragraph (b)(2) of § 210 by reference to "willful within the meaning of § 208(a) of this title" and is clearly used in the criminal sense, as stated above. Section 208(a) states: "Whoever *willfully* violates any order or regulation under this title shall be fined not more than $5,000 for each violation." (Emphasis added.)

But, under the proviso, the effect of the absence of willfulness is to require the party bringing a civil action for an overcharge to first present to the seller or renter a *bona fide* claim for refund of the overcharge without repayment of the overcharge within ninety days. Conversely, by implication, the presence of a willful over-

charge relieves the party bringing a civil action of the duty of presenting a *bona fide* claim for refund of the overcharge before commencing the civil action. And, further by implication, the presence of willfulness may be one of the circumstances warranting the exercise of discretion by the court to award treble damages and attorney's fees under paragraph (b)(1).

*Legislative History*

Furthermore, the legislative history of the Economic Stabilization Act Amendments of 1971 clearly shows that the Committee of the Conference of Managers of the House of Representatives and of the Senate reconciling the differences in the proposed amendments between the House and Senate bills eliminated the provision in the House bill authorizing treble damages only for willful violations of the price control regulations. See the *Joint Explanatory Statement of the Committee of Conference,* 2 U.S. Code Congressional and Administrative News, 92nd Congress, First Session 1971, 2283, 2307 at 2310 stating:

> The House bill authorized consumers to bring suits to recover three times the amount of the transaction from anyone *willfully* violating the price control regulations. The Senate bill contained a similar provision, but authorized suits for damages of three times the amount of the overcharge. The conferees agreed to the Senate provision.
>
> The House bill provided that in the case of an overcharge which is *not willful,* no action for an overcharge may be brought unless the plaintiff has first presented a claim for a refund and has not received repayment from the seller within ninety days. The House bill also provided that the term "willful" shall have the same meaning as in the case of criminal willfulness. The Senate bill contained a comparable provision except that it applied to violations *whether or not willful* and required repayment within a reasonable period of time as opposed to ninety days. The Conferees accepted the House provisions. (Emphasis added.)

The Senate provision is the enacted § 210 in which the requirement of proving willfulness to recover treble damages and attorney's fees does not appear. Instead in current § 210 the court is given the discretionary power to award treble damages and attorney's fees except in the event of proof by the defendant "that the overcharge was not intentional *and* resulted from a *bona fide* error, notwithstanding the maintenance of procedures reasonably adapted to the avoidance of such error." (Emphasis added.) § 210(b)(2). So to deprive the court of its discretionary power to award treble damages and attorney's fees, the defendant making the overcharge must prove that (1) the overcharge was not intentional, and (2) the overcharge resulted from a *bona fide* error notwithstanding (3) the maintenance by the defendant of procedures reasonably adapted to the avoidance of such error.

In the absence of such proof by the defendant the court in its discretion may award treble damages and attorney's fees if it finds the overcharge was intentional or resulted from reprehensible or criminal conduct, or lack of procedures reasonably adapted to the avoidance of erroneous overcharges, or bad faith, or where required by equity and the ends of justice.

The District Court found that the defendant ARCO had proved that the overcharge was unintentional and, in detail and in substance, found that ARCO acted in good faith and "maintained procedures reasonably adapted to the avoidance of overcharges." It is true that the findings were not completely in the precise language of § 210(b)(2), but the detailed findings of fact show that the defendant ARCO fully proved the existence of those facts described in the quoted language of § 210(b)(2).

Therefore, the conclusion of the District Court that the award of treble damages and attorney's fees should be denied was correct.

The mandatory supply relationship created by the regulations between ARCO and Eastern was a compelled relationship, the fruits of which have been controversy from

the start. This torpid litigation began almost nine years ago, and the record on appeal contains thirty volumes. We agree that "there are no inherently protracted cases, only cases which are unnecessarily protracted by inefficient procedures and management." [18] Judge Mishler's denial of attorney's fees and treble damages is supported both by the statute and the sound application of discretion.

We find that Judge Mishler's decision, rendered after laborious study and consideration of a welter of statutes, regulations, rulings and the briefs and arguments of counsel fully "set things right" between the parties. *Johnson Oil Co., Inc. v. DOE,* 690 F.2d 191, 203 (Em.App.1982), citing *Sauder v. DOE,* 648 F.2d 1341, 1348 (Em.App.1981), and *Tenneco Oil Co. v. Federal Power Comm.,* 442 F.2d 489, 497 (5th Cir.1971).

In light of all of the circumstances of this case, we are of the opinion that Judge Mishler's judgment should be and it is hereby AFFIRMED.

SO ORDERED.

---

18. *Manual for Complex Litigation,* frontispiece (5th rev. 1980).